FILED

2016 Mar-30  AM 09:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| TERRENCE BELL; JESSIE DIXON; CURTIS HARRIS; REGINALD HORTON; AARON HUDSON; REGINALD McKENZIE; JOHN MOORE, JR., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) )   CASE NO.  2:13-CV-1758-SLB |
| CAR WASH HEADQUARTERS, INC., d/b/a Mister Car Wash, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment on the Claims of Terrence Bell, (doc. 25), and its Motion to Strike, (doc. 34). Plaintiff Terrence Bell, together with the other named plaintiffs, have sued defendant, Car Wash Headquarters, Inc., d/b/a Mister Car Wash [MCW], alleging race discrimination, retaliation, and violation of the Fair Labor Standards Act [FLSA].  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion to Strike, (doc. 34), will be denied, and its Motion for Summary Judgment on the Claims of Terrence Bell, (doc. 25), will be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d

604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once

the moving party has met its burden, the non-moving party must go beyond the pleadings and

show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S.

317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information, affidavits or
> > declarations, stipulations (including those made for purposes of the
> > motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot produce
> > admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state

that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).

Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  And, "when conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's *version*.  [Its] duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part:  the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005)(emphasis in original); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1296 (11th Cir. 2012)(quoting *Evans*).

## II.  <u>MOTION TO STRIKE</u>

MCW has filed a Motion to Strike, asking the court to strike a number of paragraphs of Bell's Declaration, the deposition excerpts of other named plaintiffs' depositions, and some cited portions of Bell's deposition.  (*See generally* doc. 34.)  This Motion will be

denied.  The court has considered all evidence of record in the manner set forth in the following Statement of Facts.

### III.  STATEMENT OF FACTS

MCW operates a full-service car wash in Vestavia Hills, Alabama.  (Doc. 27-2 at 2, ¶ 3.)  The Vestavia location is supervised by Matt Lyle, General Manager; the Business Manager is Don Toms.  (Doc. 27-2 at 2 ¶ 4; doc. 27-5 at 3 [Toms's Depo. at 8].)  In a year, this location washes 4,000 (minimum) to 8,000 (maximum) vehicles a month; the least expensive wash is $11.99 and the most expensive wash is $49.99.  (Doc. 27-4 at 18 [Lyle's Depo. at 65-66].)  MCW employs production employees who are engaged to clean and detail cars.  (Doc. 27-2 at 4, ¶ 8.)  It also employs drivers who are certified to move customers' cars during the car wash process.  (*Id*. at 4, ¶ 9.)

Bell began working for MCW as a production employee on April 12, 2010 at $7.50 per hour.  (Doc. 27-1 at 9-10 [Bell's Depo. at 31-32, 33]; doc. 27-2 at 10 ¶ 21.)  MCW raised Bell's hourly pay rate to $8.50 per hour when he was promoted to Class B driver in July 2013.  (*Id*. at 26 [Bell's Depo. at 99-100].)

MCW opens at 8:00 a.m., Monday through Saturday, and 9:00 a.m. on Sunday.  (Doc. 27-4 at 8 [Lyle's Depo. at 27-28].)  It needs six to eight persons to open, including three to five production employees.  (*Id*. at 8-9 [Lyle's Depo. at 28-29].)  Generally, employees are scheduled on two staggered shifts, one beginning at 8 a.m. and one beginning at 9 a.m., to ensure adequate and appropriate staffing.  (Doc. 27-2 at 6, ¶ 11.)  Lyle, the General Manager

4

creates and posts a weekly schedule for all employees; the schedule designates employees' scheduled workday, start time, and work assignment.  (*Id*. at 5, ¶10(a)-(c); doc. 27-3 ¶ 10; doc. 27-4 at 10 [Lyle's Depo. at 34].)  MCW makes a concerted effort to distribute available hours across the labor force; the process generally includes dividing the available hours among employees based on reliability and availability.  (Doc. 27-2 at 6, ¶ 11.)

MCW is a weather-driven business; employees' hours are not guaranteed and may vary due to vehicle volume and weather conditions.  (Doc. 27-1 at 16 [Bell's Depo. at 60]; doc. 27-2 at 6, ¶12); doc. 27-5 at 12 [Toms's Depo. at 42-44].)  If an employee is scheduled to work and it appears that the weather may impact business, the employee is encouraged to call ahead and verify whether to report to work that day.  (Doc. 27-1 at 17 [Bell's Depo. at 63]; doc. 27-2 at 6, ¶ 12(a); doc. 27-3 ¶ 7.)  Lyle testified that employees need to contact a manager on rain days, "Because we still work on rain days."  (Doc. 27-4 at 23 [Lyle's Depo. at 86-87].)

Regardless of any scheduled start time, MCW employees need a manager's permission to clock in.  (Doc. 27-5 at 5 [Toms's Depo. at 16].)  Whether the waiting employee can clock-in, depends on the business needs; Toms testified:

> Q.  And in terms of your experience in this business, has it always been that the employee is scheduled for a time to be there but then has to ask a manager's permission to clock in?
>
> . . .
>
> A.  No.  My experience with this business is it's a weather-driven business.

Q.  Okay. And –

A.  And there's – [there are] variables with that.

Q.  Would it be a correct statement that some days . . . you don't need people and some days you need a lot of people?

A.  Again, it revolves around the weather.

. . .

Q.  Since [2007], has it been the company['s] policy that employees needed a manager's permission to clock in?

A.  It's been that they need to notify the manager that they're on premises.

. . .

Q.  But . . . the manager needs to give the employee the authorization or permission, however, you want to phrase it, to clock in?

A.  Yes.

(Doc. 27-5 at 5 [Toms's Depo. at 13-16].)  Toms is unaware of any other business where an employee is given a daily scheduled time to show up for work and then needs permission to clock-in.  (Doc. 27-5 at 6 [Toms's Depo. at 20].)

"If no work is available when an employee arrives at the scheduled start time, the employee is free to leave the car wash site and engage in or pursue personal activities and is not required to return until the next scheduled shift.  Employees can leave a phone number where they can be reached, or they can call or check back periodically to see if any work has become available."  (Doc. 27-2 at 7 ¶ 13; *see also* doc. 27-1 at 17-18 [Bell's Depo. at 63, 65-

6

66]; doc. 27-4 at 13 [Lyle's Depo. at 45-48].) Employees are not required to or expected to wait on or off premises when not clocked in for work. (Doc. 27-1 at 18 [Bell's Depo. at 65]; doc. 27-2 at 8 ¶ 17; doc. 27-5 at 9-10 [Toms's Depo. at 31, 33-34].) A sign in the break room states, "Employees who are not clocked in are neither required nor expected to remain on Company premises." (Doc. 27-1 at 78; *see also id*. at 32 [Bell's Depo. at 124]; doc. 27-2 at 8, ¶ 16; doc. 27-4 at 30 [Lyle's Depo. at 114].) At one time, the sign was a little torn up and faded; Lyle replaced this sign with a clean copy in 2012. (Doc. 27-4 at 30 [Lyle's Depo. at 115].)

An employee may not clock-in at his scheduled time for several reasons, including that he was late or that there was no work available. (Doc. 27-4 at 26 [Lyle's Depo. at 97-98, 99-100].) Although Bell could not always clock in at his scheduled start time, he was expected to be on site at, or to have called before, his scheduled start time. (Doc. 27-4 at 23 [Lyle's Depo. at 86-88]; see doc. 27-1 at 17 [Bell's Depo. at 62-63].) Employees are expected to be present, in uniform, for the start of their scheduled shifts or to have contacted a manager before the start of their scheduled shifts. (Doc. 27-4 at 23 [Lyle's Depo. at 88].) By placing an employee on the schedule, MCW expects that employee to clock in at some point during the day. (Doc. 27-5 at 7 [Toms's Depo. at 21].)

When he was hired, Bell "agree[d] to comply with policies set forth in [MCW's Employee] Handbook as a condition of [his] continued employment with [MCW] . . . ."

7

(Doc. 27-1 at 64-65; *see also* doc. 27-1 at 10 [Bell's Depo. at 33].)  The Employee Handbook states:

> Attendance and Punctuality
>
> [MCW] requires employees to report to work on time and work all scheduled hours and any required overtime.  You should notify your manager as far in advance as possible whenever you are unable to report for work. Unauthorized or excessive absences or tardiness will result in disciplinary action, up to and including termination of employment.
>
> . . .
>
> No Call/No Show is when you don't show up for work or call in for 3 days. If this happens you can lose your job.
> . . .
>
> Employee Waiting
>
> Employees are neither required to nor expected to wait on or off premises when not clocked in for work.  If you are scheduled to work and it appears that the weather may impact the business, call ahead and verify that you should report to work that day.  Employees may be asked to leave and call back later.

(Doc. 27-1 at 70.)  During the application process, Bell signed an acknowledgment that his punctuality was important.  (*Id*. at 64.)  MCW relies on employees to be on time so the cars can be washed.  (Doc. 27-4 at 12 [Lyle's Depo. at 42].)  If all employees stayed at home, the car wash would not be able to open; "[i]t would be a challenge."  (Doc. 27-5 at 6 [Toms's Depo. at 20].)

Bell testified:

> Q.  . . .  You're not required to wait, true?

8

A.  Yes.

Q.  You may decide to wait because you want to be clocked in when work becomes available, but that's a choice that the employee makes, true?

A.  That the employee make[s]?  Not all the time.

Q.  When is it not?

A.  If you get there and it's not busy [and] you leave, sometimes you can get in trouble for that.

Q.  Have you ever gotten in trouble for it?

A.  No.

(Doc. 27-1 at 33 [Bell's Depo. at 125-26].)  Lyle testified that he had never disciplined an employee for leaving the premises when not clocked in for work because work was not available and that he was unaware of any other manager disciplining an employee under those circumstances.  (Doc. 27-2 at 8, ¶ 18; *see also* doc. 27-3 ¶ 7.)

If an employee has clocked in and begun work and business subsequently becomes slow due to vehicle volume and/or weather conditions, MCW takes volunteers who want to leave work early.  (Doc. 27-2 at 6, ¶12(b); doc. 27-4 at 16 [Lyle's Depo. at 57-59].) Employees who volunteer are not penalized for leaving early, except for losing hours on the clock.  (Doc. 27-2 at 6, ¶12(b); doc. 27-4 at 16 [Lyle's Depo. at 57-59].)  If business is slow an employee may leave after letting "somebody know" they are leaving.  (Doc. 27-1 at 18 [Bell's Depo. at 65].)  Employees are not required to arrive at MCW ***before*** their scheduled start time.  (Doc. 27-1 at 19 [Bell's Depo. at 71]; doc. 27-2 at 6 ¶ 11; doc. 27-3 ¶ 6.)

Employees are not allowed to perform any work before clocking in or after clocking out. (Doc. 27-1 at 18 [Bell's Depo. at 66]; doc. 27-2 at 6, ¶ 11(b).)  Bell never performed any work cleaning vehicles at MCW prior to clocking in or after clocking out. (Doc. 27-1 at 28 [Bell's Depo. at 105].)

According to Lyle, when some work is available, but more employees arrived for their scheduled shift than the available work requires, employees with the fewest hours worked during that workweek are typically clocked in first.  (Doc.. 27-2 at 7 ¶ 14; *see also* doc. 27-1 at 19 [Bell's Depo. at 69]; doc. 27-4 at 27[ Lyle's Depo. at 103-04].)  He testified, "We try to be fair with the hours.  And at the beginning of the week, we will clock in employees that are available; and towards the end of the week, we will let the guys with the least amount of hours clock in first." (Doc. 27-4 at 27 [Lyle's Depo. at 104].)  However, Bell contends that white employees are clocked in ahead of African-American employees.  (Doc. 27-1 at 18 [Bell's Depo. at  68].)  In his Declaration, Bell testified:

> 21.   While employed at [MCW], I . . . experienced race discrimination[.] I observed white employees who were instructed to clock-in before the African-American employees, regardless of who had the most hours.

> 22.  White employees could arrive later than myself and yet be clocked in earlier.

> 23.  I do not remember all their names[;] I understand from Reginald Horton that one [of] their names was Chris.

> 24.  This routine practice of clocking-in white employees first was witnessed by many [of my] co-workers.

(Doc. 30-1 at 6 ¶¶ 21-24 [footnote added].)  However, in his deposition, he testified:

Q.  . . .  So your allegation is that you were discriminated against because other employees were chosen to work a specific day or a specific hour?  Is that what you're saying?

A.  Yes.

Q.  Is there a particular incident that you're referring to?

A.  No particular incident.  I can't think of any right now.

Q.  Can you identify as we sit here today any employee who was chosen to work a day or an hour when you weren't chosen that you believe was discriminatory?

A.  No, I don't have [any] dates or nothing like that right now.

Q.  You don't have any dates?

A.  No.

Q.  You don't have any names?

A.  Nicknames, no real names.  I don't know people by their real names up there.

Q.  Give me some nicknames.

A.  There were some brothers that [were] working there, and I can't think of their name[s].  But [MCW does not] have them on the employment sheet for 2012.[1]

_____

[1](*See* doc. 34-1 at 19 [Horton's Depo. at 72].)    Horton also testified that these brothers showed him their hours after they were allowed to clock in ahead of waiting African-American production employees; Horton testified that they had "way more" hours than other employees.  (*Id*. [Horton's Depo. at 69].)  Bell testified that these brothers clocked in ahead of him on a Monday, so no production employees had any hours.  For purposes of deciding the Motion for Summary Judgment as to Bell's claims, Bell's testimony must be

. . .

Q.  . . .  Are you saying that these employees were selected –

A.  Yes.

Q.  – to work and you weren't?

A.  Yes.

Q.  Okay.  And do you know in that particular situation the number of hours that those employees had when they were selected?

A.  It was a Monday, so nobody had [any] hours.

. . .

Q.  Do you know how the decision was made?

A.  No.

. . .

Q.  . . .  Do you have any basis for a belief that that decision was made because these brothers were white and you're black?

A.  Do I have any criteria?

Q.  Do you have any basis for that belief?  Do you have any facts that would support your belief that it was because they're white and you're black?

A.  No.

(Doc. 27-1 at 22-23 [Bell's Depo. at 83-87] [footnote added].)  Bell concedes MCW's policy is to clock in employees who have worked the fewest hours in that week first. (Doc. 27-1 at

credited.

12

18-19 [Bell's Depo. at 68-69].)  Lyle denies he considered race when determining which employee to clock in first.  (Doc. 27-2 at 7 ¶ 14.)  Also, he specifically denies that Bell's race or his EEOC charge played any role in any employment decision.  (*Id*. at 14, ¶ 25.)  Carlos Carey, African-American, testified that he usually clocked in "before anyone else," and he "believe[s] the reason [he] was clocked in first [was] because [his] managers and supervisors respected the fact that I showed up every day and did [his] job."  (Doc. 27-3 ¶ 11.)

Also as evidence showing white employees were clocked in ahead of him, Bell presents evidence concerning the total number of hours in a single year worked by two white employees, Richard Suggs and Mark Caldwell, compared to the total number of hours he worked.  He argues this evidence "means such employees had to be getting more hours on a weekly basis."  (Doc. 29 at 21, ¶ 62.)  He states:

> 62.  . . .  For example, a white employee named Richard Suggs was hired 3/24/2011, and by the end of the year he accumulated 1,392 hours and 22 hours of overtime.  [(]Doc. 27-2 [at] 142.[)]  Bell started at Mister Car Wash in 2010 and worked the entire year 2011.  Despite working 3 months longer than Mr. Suggs, Bell had less hours on the clock, (total 1,180, and no overtime).
>
> 63.  Another example from the year 2011 is a white employee named Mark Caldwell.  Mr. Caldwell was employed from 04/02/2011 to 11/26/2011.  In his seven months of employment, Mr. Caldwell accumulated 1,144.08 regular hours and 20.90 [overtime hours].  Bell's total hours for that year were 1,180[.]  [T]he only way Caldwell [could have] accumulated 36 hours less than Bell in 7 months of employment is if he was routinely being clocked-in [ahead of Bell].  Based on his short duration of employment Caldwell was getting close to 40 hours a week.  Bell typically received about 20-23 hours per week, not counting the waiting time.  [(]Doc. 27-1 [at] 165-272[)].

(Doc. 29 at 21-22, ¶¶ 62-63.)

Bell testified that Monday through Saturday he took the bus to work and arrived by 8:00 A.M.  (Doc. 27-1 at 31 [Bell's Depo. at 120].)  He testified that he believed he could be disciplined for leaving after he arrived at work and that he had seen another employee written up for leaving.  (*Id*. at 32 [Bell's Depo. at 123].)  However, Bell could not identify the employee who was not clocked in that he had seen written up for leaving when work was not available.  (*Id*.)  Despite this testimony, Bell testified that he knew employees were not required to wait if not clocked in.  (Doc. 27-1 at 33 [Bell's Depo. at 125].)  During his deposition, Bell testified as follows:

> Q. . . . Would  you agree with me that [the sign] reflects the policy of [MCW] about waiting?
>
> . . .
>
> A.  Yes.
>
> Q. . . . And you told me earlier that Matt Lyle or any other supervisor never told you that you had to wait on the premises, correct?
>
> A.  Yes.
>
> Q.  You were not required to, true?
>
> . . .
>
> A.  You're not required to wait?
>
> Q. . . .  You're not required to wait, True?
>
> A.  Yes.
>
> Q.  You may decide to wait because you want to be clocked in when work becomes available, but that's a choice the employee makes true?

> A.  That the employee make[s]?  Not all the time.
>
> Q.  When is it not?
>
> A.  If you get there and it's not busy, you leave, sometimes you can get in trouble for that.
>
> Q.  Have you ever gotten in trouble for  it?
>
> A.  No.

(Doc. 27-1 at 33 [Bell's Depo. at 125-26].)[2]

Bell has submitted a number of disciplinary write-ups, (doc. 30-1 at 23-30); however, none of the disciplinary write-ups, Employee Counseling Reports [ECR], are for leaving the site when not clocked in, (*id*.).  Reginald Horton, a named plaintiff, was written up on October 8, 2010, December 21 and 22, 2012,  and June 22, 2013, for unexcused absences, noting "no call/no show."  (*Id*. at 23-26.)  According to MCW, "[a] no call/no show is not discipline for leaving work when not clocked in because no work is available."  (Doc. 27-2 at 8-9,¶ 18(a).)

Reginald McKenzie, another named plaintiff, was written up on July 10, 2010, July 26, 2012, and February 17, 2014, for "no call/no show" absences.  (*Id*. at 27, 29-30.) McKenzie was also written up on January 3, 2011, for tardiness; he had shown up two hours late and had not called "to let [a manager] know he was running late." (*Id*. at 28.) McKenzie

---

[2]MCW has moved to strike Bell's Declaration testimony that he was not free to leave on the ground that this testimony conflicts with Bell's deposition testimony and the discrepancy is not explained.

testified that employees felt pressure to stay on site when not clocked in, stating "If you leave, you're not going to work that day.  But when you come back the next day, you might get a write-up or you might get threatened with your job."  (Doc. 34-3 at 23, [McKenzie's Depo. at 87].)   However, McKenzie testified he did not know of anyone who had been disciplined for leaving MCW's premises when not clocked in and no work was available. (*Id*. at 25 [McKenzie's Depo. at 96].)

Bell contends, "Any suggestion that un-clocked in employees are free to leave is refuted by the written discipline issued to MCW employee Curtis Harris."  (Doc. 29 at 12 [citing doc. 30-1 at 21].)  This ECR states, "Curtis was told to clock in & help clean.  He did not want to clock in."  (Doc. 30-1 at 21.)  The ECR does not indicate what time Harris was told to clock in, if Harris had arrived at his scheduled time and was not allowed to immediately clock in, or if Harris was on site after clocking out.  (*See id*.)  The court finds this ECR does not support a reasonable inference that Harris was disciplined for leaving when he was not on the clock.

Harris testified that he did not remember the incident and did not remember if he was scheduled to work on the day of the incident.  (Doc. 34-4 at 21 [Harris's Depo. at 79-80].) When asked, "Were you ever disciplined after showing up to work and not getting clocked in, whether there was work available or not getting clocked in and leaving?  Were you ever disciplined for that?," Harris responded, "No."  (*Id*. at 33 [Harris Depo. at 126-27].)

Assuming he arrived at MCW before 9:00 a.m. every scheduled workday and such time is compensable, Bell argues MCW paid him less than minimum wage. As an "egregious example," Bell cites the following facts from the week of May 14, 2012:

> [D]uring the week of 5/14/2012 through 5/20/2012, Bell arrived by the scheduled 9:00 am [start time] and waited as follows:
>
> > 5/15/2012  clock-in at 11:37 am; wait time:  2.37 hours
> > 5/17/2012  clock-in 11:18 am; wait time:  2.18 hours
> > 5/18/2012  clock-in 11:20 am; wait time:  2.20 hours
> > 5/19/2012  clock-in 10:38 am; wait time:  1.38 hours
> > 5/20/2012  clock-in 9:20 am; wait time: 20 minutes.
>
> The total wait time for the week 5/14/2012–5/20/2012 was 8.33 hours.

(Doc. 29 at 17-18, ¶ 47 [citing doc. 30-1 at 4-5, ¶ 15].)

For that week, Bell was paid for 20.97 hours, (doc. 27-1 at 147), denoting 20.97 production hours on the clock, (doc. 30-1 at 5, ¶ 16). At $7.50 per hour, Bell's gross pay for this week was $157.28 (20.97 x 7.50= $157.28). (*Id.* ¶ 17.) If, however, the alleged waiting time, 8.33 hours, is added to his clock time of 20.97 hours, the total compensable hours equals 29.3 hours. (*Id.* ¶ 18.) This number of hours divided into Bell's gross pay for this week results in an hourly wage of approximately $5.37 per hour. (*Id.* ¶ 19.)

Bell filed an EEOC Charge on August 7, 2012. (Doc. 27-1 at 19 [Bell's Depo. at 72], 86.) On September 21, 2012, he received an ECR, issued by his supervisor, Carey, who is also Bell's brother, and an assistant manager, Royce Matthews. (*See* doc. 27-2 at 122.) The ECR stated:

17

> [Bell] has been shown how to clean a car several time[s].  He continues to do
> substandard work (i.e. door jams, cup holders, door pockets, ash trays[)].  He
> failed to clean any of [these] on [an] Acura MDX.  Supervisor had to fix to
> please customer.

(*Id*.)  This ECR did not result in a suspension or any loss of pay.  (Doc. 26 at 13, ¶ 42; doc.

29 at 8.)  With regard to this incident, Bell testified:

> . . .  [O]ne time . . . y'all . . . wrote me up for missing a cup holder.[3]
> And I watched other guys, white, miss[ ] lots of stuff, but I got wrote up for
> missing a cup holder, the [one or two] times that I have been written up.[4]
>
> . . .
>
> Q.  Do you know whether any white employees have been written up
> for performance issues?
>
> A.  No.
>
> Q.  These instances where you saw other people miss things, do you
> know whether any supervisor saw those employees miss things and didn't
> write them up?
>
> A.  I can't think of that right now.
>
> Q.  Okay.  Would you have any reason to know whether someone got
> written up for a performance issue?
>
> A.  Would I know?  No.
>
> Q.  Okay.  So when you say that you were treated differently, you don't
> really know for sure whether you were treated differently, because you don't
> know how they were treated in those instances, right?

---

[3]As set forth above, Bell was written up for missing more than a cup holder; he was
written up for failing to clean"door jams, cup holders, door pockets, [and] ash trays."  (Doc.
27-2 at 122.)

[4]Bell does not have a claim for race discrimination based on this ECR.

A.  Yes.

(Doc. 27-1 at 24 [Bell's Depo. at 91-92].)

On October 3, 2012, Bell received another ECR following a customer's complaint,

which stated:

> Supervisor Jacob Brooks asked Terrence Bell to go back over his work on a
> white Range Rover.  Terrence Bell did not follow Jacob's instructions
> resulting in the customer coming back very dissatisfied  with service.

(Doc. 27-2 at 120.)  This ECR was issued by Lyle.  (*Id.*)

Bell received a raise and promotion to driver after he filed his EEOC Charge. (Doc.

27-1 at 13 [Bell's Depo. at 45]; doc. 27-2 at 10-11 ¶ 21(d)-(e).)

On March 10, 2013, Bell and other MCW employees were issued a memo that stated:

> Employees, it seems the vast majority of our production staff refuses to come
> to work in uniform.  As of 3/11/13, if you do not come to work in uniform
> (**<u>SHAVED (that day)</u>**, black shoes, blue pants, etc etc) you WILL be written
> up.  Three times and you WILL be terminated.  It also seems that we have a lot
> of no call/no shows recently which has caused us to be short on busy days.  As
> of 3-11-13 if you do not call or show up to work you WILL be written up.
> Three times, no call/no show and you WILL be terminated.  No questions
> asked.  This is the company policy that everyone signed off on (employee hand
> book) when they became a Mister Car Wash employee.

(Doc. 27-2 at 119 [emphasis in original].)

On September 24, 2013, Bell and six other African-American production employees

filed a Complaint alleging race discrimination and retaliation in violation of Title VII and §

1981.  They also alleged violation of the Fair Labor Standards Act [FLSA] based on MCW's

failure to pay production employees for the time spent waiting on site between their scheduled start time and the time they actually clocked in.

The record contains the MCW schedules from June 3, 2013 through September 2014. (Doc. 27-4 at 67-132.) These schedules show Bell was consistently scheduled 9:00 a.m. to close, Monday and Thursday through Sunday; his off days were Tuesday and Wednesday. (*Id.*) Also in the record are some of Bell's time cards for this period. (Doc. 27-1 at 136-44.) When the schedules and time cards are compared, these records do not reveal consistent attendance.

For the week beginning January 6, 2014, Bell had hours on Wednesday, his off day, when he clocked in at 1:14 p.m.; he did not work on Monday, Friday, or Saturday. (Doc. 27-1 at 136; doc. 27-4 at 102.) On Thursday he clocked in at 9:24 a.m. and on Sunday he clocked in at 9:37 a.m. (Doc. 27-1 at 136.) These records do not indicate when Bell arrived on site. The following week, Bell was again scheduled for Monday and Thursday through Friday. (Doc. 27-4 at 101.) He worked Tuesday through Sunday: he clocked in at 9:01 a.m. on January 14, 2014, he clocked in at 9:41 a.m. on January 15, 2014, he clocked in at 9:33 a.m. on January 16, 2014, he clocked in at 8:27 a.m. on January 17, 2014, he clocked in at 9:41 a.m. on January 18, 2014, and he clocked in at 9:21 a.m. on January 19, 2014. (Doc. 27-1 at 137.) The records do not show what time Bell arrived on the job site.

For the weeks between January 20, 2014 and March 9, 2014, the record shows as follows:

20

| Date | Scheduled/Start Time | Time Clocked In |
|---|---|---|
| January 20, 2014 | No Schedule | 8:30 a.m. |
| January 22, 2014 | No Schedule | 10:56 a.m. |
| January 23, 2014 | No Schedule | 11:32 a.m. |
| January 25, 2014 | No Schedule | 9:36 a.m. |
| January 26, 2014 | No Schedule | 9:10 a.m. |
| January 27, 2014 | 9:00 a.m. | 8:55 a.m. |
| January 30, 2014 | 9:00 a.m. | Did not Work |
| January 31, 2014 | 9:00 a.m. | 9:02 a.m. |
| February 1, 2014 | 9:00 a.m. | 8:14 a.m. |
| February 2, 2014 | 9:00 a.m. | 10:43 a.m. |
| February 3, 2014 | 9:00 a.m. | 10:13 a.m. |
| February 5, 2014 | Not Scheduled | 9:53 a.m. |
| February 6, 2014 | 9:00 a.m. | 10:00 a.m. |
| February 7, 2014 | 9:00 a.m. | 9:10 a.m. |
| February 8, 2014 | 9:00 a.m. | 8:59 a.m. |
| February 9, 2014 | 9:00 a.m. | 9:23 a.m. |
| February 10, 2014 | 9:00 a.m. | Did Not Work |
| February 13, 2014 | 9:00 a.m. | Did Not Work |
| February 14, 2014 | 9:00 a.m. | 8:58 a.m. |
| February 15, 2014 | 9:00 a.m. | 8:43 a.m. |
| February 16, 2014 | 9:00 a.m. | 9:09 a.m. |
| February 17, 2014 | 9:00 a.m. | 8:17 a.m. |
| February 19, 2014 | Not Scheduled | 9:49 a.m. |
| February 20, 2014 | 9:00 a.m. | 10:51 a.m. |
| February 21, 2014 | 9:00 a.m. | 8:23 a.m. |
| February 22, 2014 | 9:00 a.m. | 9:03 a.m. |
| February 24, 2014 | 9:00 a.m. | 8:58 a.m. |
| February 27, 2014 | 9:00 a.m. | 9:35 a.m. |
| February 28, 2014 | 9:00 a.m. | 8:20 a.m. |
| March 1, 2014 | 9:00 a.m. | 8:27 a.m. |
| March 2, 2014 | 9:00 a.m. | 8:54 a.m. |
| March 1, 2014 | 9:00 a.m. | 8:27 a.m. |
| March 5, 2014 | Schedule Illegible | 9:29 a.m. |
| March 6, 2014 | Schedule Illegible | 8:08 a.m. |
| March 7, 2014 | Schedule Illegible | 8:38 a.m. |
| March 8, 2014 | Schedule Illegible | 8:21 a.m. |
| March 9, 2014 | Schedule Illegible | 8:56 a.m. |

(Doc. 27-1 at 138-44; doc. 27-4 at 95-100.)

Bell resigned from MCW in October or November of 2014.  (Doc. 27-2 at 11 ¶ 21(f);

doc. 27-4 at 18 [Lyle's Depo. at 67-68]; doc. 30-1 at 2 ¶ 2.)

## IV.  DISCUSSION

### A.  FLSA – WAIT TIME AND MINIMUM WAGE

MCW contends that it is entitled to summary judgment as to Bell's FLSA claim

because Bell's voluntary wait time is not compensable.  (Doc. 25 at 2.)  Bell disagrees.

> Time spent waiting for an employer's call to duty may be compensable
> under the FLSA."  *Preston v. Settle Down Enters.*, 90 F. Supp. 2d 1267, 1278
> (N.D. Ga. 2000)(citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 136 (1944)).
> The distinction between compensable and non-compensable time turns on
> whether an employee is "engaged to be waiting," which is compensable time;
> or whether the employee is "waiting to be engaged," which is not.  *Id*.  Given
> the requirement to report on time, in uniform and shaved, Bell was engaged to
> be waiting.
>
> . . .  [MCW] employees are expected to wait for enough cars to wash.
> Rather than being sent home, employees are asked to wait.

(Doc. 29 at 25 [internal citations omitted].)

Whether an employee's time spent waiting for a call to duty, and is thus compensable, depends on the particular facts and circumstances of the individual case.[5]  *See* 29 C.F.R. § 785.14.

> Time spent waiting for an employer's call to duty may be compensable under the FLSA.  *See Skidmore v. Swift & Co.,* 323 U.S. 134, 136, 65 S. Ct. 161, 163, 89 L. Ed. 124 (1944).  The distinction between compensable and non-compensable time is drawn this way:  a worker who is "engaged to be waiting" is entitled to compensation while a worker who is "waiting to be engaged" is not.  *LaPorte* [*v. General Elec. Plastics*], 838 F. Supp. [549,] 554 [(M.D. Ala. 1993)](citing *Skidmore,* 323 U.S. at 140, 65 S. Ct. at 164).  The inquiry is whether "the time is spent predominately for the employer's benefit or for the employee's."  *Birdwell v. City of Gadsden, Ala.,* 970 F.2d 802, 807 (11th Cir. 1992)(citing *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S. CT. 165, 168, 89 L. Ed. 118 (1944)).  An employee is on duty, is engaged to wait, where "waiting is an integral part of the job."  29 C.F.R. § 785.15.  An employee is off duty, is waiting to be engaged, where he is "completely relieved from duty" and where the time period is "long enough to enable him to use the time effectively for his own purposes."  29 C.F.R. § 785.16(a).  However, an employee "cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived."  *Id.*  Whether an employee is waiting to be engaged or engaged to be waiting depends on all the circumstances of the case.  *Armour,* 323 U.S. at 133, 65 S. Ct. at 168.

*Preston v. Settle Down Enterprises, Inc.*, 90 F. Supp. 2d 1267, 1278-79 (N.D. Ga. 2000).

Some of the particular facts to be considered are "construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by

---

[5]"Certain sets of facts, if found by a fact finder, will give rise to liability under the FLSA while other sets of facts will not.  It is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist."  *Birdwell v. City of Gadsden*, 970 F.2d 802, 808 (11th Cir. 1992).

conduct, consideration of the nature of the service, and its relation to the waiting time." *Swift & Co.*, 323 U.S. at 137.  The regulations provide, "Periods during which [1] an employee is completely relieved from duty and [2] which are long enough to enable him to use the time effectively for his own purposes are ***not*** hours worked."   29 C.F.R. § 785.16(a)(emphasis added).  Further, an employee "is not completely relieved from duty and cannot use the time effectively for his own purposes ***unless*** [1] ***he is definitely told in advance that he may leave the job*** and [2] ***that he will not have to commence work until a definitely specified hour has arrived***.  *Id*.  (emphasis added).

The court has no difficulty finding that Bell was "definitely told in advance" that he was free to leave the job site if not clocked in.  Moreover, the testimony appears undisputed that, if he left the job site, he would not be required to return until his next scheduled shift. Obviously, an employee will not work that day if he leaves and does not return until his next scheduled shift, but this fact is not sufficient to make wait time compensable.  Given that the court's focus is on whether wait time is sufficiently long and without restrictions to allow an employee to engage in personal activities, MCW's policy that the employee can leave if not clocked in and is not required to return until his next scheduled shift demonstrates that MCW is not liable to pay for Bell's time spent waiting to clock in.

Bell testified he was not asked to wait on site before clocking in.  Also, he testified that he ***knew*** MCW did not require him to wait on site.  He testified that "sometimes" an employee might "get in trouble" for leaving the job site if not clocked in, but he was never

24

disciplined for such conduct.  As the court is required to credit Bell's version of facts, at least for Bell's claim for compensable wait time, see *Evans*, 407 F.3d at 1278, the court finds that Bell was not engaged to wait and any time spent waiting to clock in, which he testified was his choice to wait, is not compensable.  *Cf. Chapman v. Grable Plumbing Co.*, No. 8:10-CV-1202-T-30AEP, 2011 WL 3269628, at *5 (M.D. Fla. Aug. 1, 2011)(denying summary judgment based on disputed issue of fact as to whether plaintiff was ***required*** to be in his service van at 7:30 a.m. waiting to receive a service call); *Anderson v. Decker Car Wash*, Civil Action No. 1:09-CV-2988-ODE, doc. 81 at 23-24 (N.D. Ga. June 6, 2011)(finding "genuine issue of material fact . . . as to whether Plaintiffs were ***actually*** allowed to leave whenever they were not on the clock," even though official policy stated that employees could leave or stay "all at their own will")(emphasis added); *Donovan v. 75 Truck Stop*, 80-9-Civ-Oc, 1981 WL 2333, *11-12 (M.D. Fla. July 20, 1981)(finding wait time in between washing trucks was compensable because periods of idle time were unpredictable and "usually of short duration" and employer expected employees to remain on site "so they would be prepared to commence work at the moment the next truck arrived").  Bell's testimony that some unidentified employees might get in trouble if they left before clocking in is insufficient to create a disputed issue of fact as to whether the actual policy of MCW towards Bell was to require him to wait on site to be clocked in.

The court finds that MCW's Motion for Summary Judgment as to Bell's FLSA claim is due to be granted.

25

## B.  TITLE VII & SECTION 1981

### 1.  Disparate Treatment

Bell claims that white employees were allowed to clock in before African-American employees on those days when production employees did not clock in at their scheduled start time due to bad weather or the lack of vehicles to wash.  (Doc. 29 at 31.)  MCW contends that it is entitled to summary judgment as to Bell's discrimination claim because "Bell cannot establish a prima facie case," and he "cannot establish pretext."  (Doc. 25 at 2.)

Because Bell relies upon circumstantial evidence to prove his disparate treatment claim, the court's analysis is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).  The Supreme Court has explained this framework as follows:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff suffered an adverse employment action for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

26

Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 142-43 (internal citations and quotations omitted).

### a.  Prima Facie Case

In this Circuit, a plaintiff may establish a prima facie case of discrimination by showing:

(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job.  Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)(internal citations omitted).  Bell's race discrimination claim is based on his allegation that white employees were allowed to clock in before him on days when production employees did not clock in according to the schedule.[6]  During his deposition, Bell testified that he believed he was discriminated against

_____

[6]In his brief, Bell argues that he has a claim under 42 U.S.C. § 2000e-2(a)(2), making it illegal for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  Title VII "proscribes not

on the basis of his race because "other employees were chosen to work a specific day or a specific hour," although he could not recall a particular incident.   (Doc. 27-1 at 22 [Bell Depo. at 83].)   He did testify that "[t]here [were] some brothers," who were not "on the employment sheet for 2012," and these brothers, who were white, were selected to work before Bell on "a Monday, so nobody had [any] hours."   (*Id.* at 22-23 [Bell's Depo. at 84-85].)

The court assumes without deciding that Bell can establish a prima facie case of discrimination with regard to the order in which production employees were allowed to clock in based on the incident involving these two white employees.

### b.  Articulated Non-Discriminatory Reason

"Once a prima facie case is established, a defendant must proffer legitimate, nondiscriminatory reasons for its employment decision." *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999)(citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998)).   MCW contends, "Available hours are divided among employees based on reliability and availability.   When work is available for fewer employees

---

only overt discrimination[, *see* § 2000e-2(a)(1),]  but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).  Section § 2000e-2(a)(2) proscribes liability based on a disparate impact theory. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2519 (2015)("Both Title VII and the ADEA contain identical "because of" language, see 42 U.S.C. § 2000e–2(a)(2); 29 U.S.C. § 623(a)(2), and the Court nonetheless held those statutes impose disparate-impact liability.").   The Complaint in this case does not contain a claim for disparate impact race discrimination.

28

[than] scheduled, employees with the lowest hours worked during that workweek are typically clocked in first." (Doc. 26 at 20-21.) Lyle testified that, at the beginning of the week, he may clock in the employees in the order they arrived. (Doc. 27-4 at 28 [Lyle's Depo. at 107-08].) He testified, "We try to be fair with the hours. And at the beginning of the week, we will clock in employees that are available; and towards the end of the week, we will let the guys with the least amount of hours clock in first." (*Id*. at 27 [Lyle's Depo. at 104].)

These reasons for selecting the order employees clock in is sufficient to satisfy MCW's burden to articulate a legitimate, nondiscriminatory reason.

### c. Pretext

The law in this circuit is well established: A plaintiff may not establish pretext merely by quarreling with the wisdom of the alleged discriminatory and/or retaliatory decision. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997). "A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). The relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated

29

its conduct." *Combs*, 106 F.3d at 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). "To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons [have] no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted). However, "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)). The court's pretext "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(other citations omitted).

Bell argues:

> Documents submitted by Mister Car Wash confirm Bell's recollection (supported by other witness testimony) that ***white employees who had more weekly hours were clocked-in ahead of African-American employees***.

> For example, a white employee named Richard Suggs was hired 3/24/2011, and by the end of the year he accumulated 1392 hours and 22 hours of overtime. Doc. 27-2, pg. 142. Bell started at Mister Car Wash in 2010 and worked the entire year 2011. Despite working 3 months longer than Mr. Suggs, Bell had less hours on the clock, (total 1,180, and no overtime). *Id*.[;] Bell Dec.¶ 26. Suggs can only accomplish that feat if he is receiving more hours on weekly basis.

Another example from the year 2011 is a white employee named Mark Caldwell. Mr. Caldwell was employed from 04/02/2011 to 11/26/2011. In his seven months of employment, Mr. Caldwell accumulated 1,144.08 regular hours and 20.90. Bell Dec. ¶[¶] 27-28. Bell's total hours for that year were 1,180, the only way Caldwell accumulated 36 hours less than Bell in 7 months of employment is if ***he was routinely being clocked-in ahead of Bell***. *Id*. Based on Caldwell's short duration of employment, he was getting close to 40 hours a week. Bell typically received about 20-23 hours per week, not counting the waiting time. Doc. 27-1 pg. 165-272.

(Doc. 29 at 30-32 [emphasis added].)  In response, MCW contends:

. . . Bell's contention that he was unlawfully denied working hours is wholly unsupported. Bell contends he was treated less favorably than white employees Richard Suggs and Mark Caldwell because they were hired after him and worked more hours than he did in 2011. (Doc. 29, pp. 31-32). Bell's reliance on Suggs and Caldwell as valid "comparators" is misplaced for several reasons. First, assuming, arguendo, that Suggs and Caldwell began working at MCW after Bell, work hours are allocated among employees based on reliability and availability — <u>seniority plays no role</u>. (Facts, ¶11). Second, Bell has provided no evidence that he, Suggs and Caldwell are similarly situated in all relevant aspects; indeed, he does not even bother to try. Finally, Bell's comparison of his hours worked relative to Suggs and Caldwell is disingenuous. Bell cannot selectively choose Suggs and Caldwell as comparators and ignore a significant group of comparators who were treated equally or less favorably than he. There has been no showing that any allocation of work hours was motivated by race discrimination. (Facts, ¶¶36-37). Consequently, summary judgment is due to be granted on this claim.

(Doc. 33 at 15-16.)

During his deposition, Bell testified that he believed he was discriminated against on the basis of his race because "other employees were chosen to work a specific day or a specific hour," although he could not recall a particular incident. (Doc. 27-1 at 22 [Bell Depo. at 83].)  The only incident he generally recalled was that "[t]here [were] some brothers," who were not "on the employment sheet for 2012," and he remembered that these

white brothers were selected to work before him on "a Monday, so nobody had [any] hours." (*Id*. at 22-23 [Bell's Depo. at 84-85].)  Bell testified he did not know the reason these white brothers were selected to work or the criteria used to selected them.  (*Id*. at 23 [Bell's Depo. at 85-86].)  And, he knew of no facts that would support a finding that the decision was made based on race.  (*Id*. [Bell's Depo. at 87].

Bell does not argue that Suggs and Caldwell were the white brothers who had clocked in ahead of him on a Monday or that Suggs and/or Caldwell were ever actually clocked in ahead of him.  As set forth above, he argues only that Suggs and Caldwell must have been clocked in ahead of him based on the total number of hours each individual worked 2011, and, because Suggs and Caldwell are white, race must have been the reason they were clocked-in ahead of Bell, who is African-American.

As set forth above, to the extent evidence is available, Bell was consistently scheduled to work Monday, Thursday, Friday, Saturday, and Sunday, at least on all the legible schedules from 2013 and 2014.  Comparing the schedules to Bell's time cards from the same period, Bell did not always work this set schedule.  Sometimes he clocked in after 9:00 a.m.; sometimes he clocked in before 9:00 a.m.  Some time cards show work on a Wednesday, one of Bell's regular off days.  Some time cards show that he did not work at all on scheduled days.  Besides Bell's testimony that he always arrived at work by 8:00 a.m. Monday through Saturday, nothing else in the record indicates his actual arrival time or the reason why he

clocked in after his scheduled start time of 9:00 a.m.  The record contains no evidence of arrival time, schedules, or time cards for Suggs and Caldwell.

On this record, the court does not find a disputed issue of fact regarding whether white employees were clocked in ahead of Bell based on race and/or whether MCW's articulated reason is unworthy of credence.  Evidence of the total hours worked by Suggs and Caldwell may suggest that further discovery would have revealed evidence that they were clocked in ahead of Bell when he had fewer hours or when he had arrived on site earlier.  However, the total number of hours worked by Bell, Suggs, and Caldwell in a year does not support an inference that Suggs and Caldwell were clocked in ahead of Bell on any particular day, that Bell had arrived on site before Suggs and Caldwell, or that he had worked fewer hours in a particular week.  Therefore, the court finds that Bell has not rebutted MCW's articulated reason for the order of selecting available employees to clock in.

MCW's Motion for Summary Judgment on Bell's disparate treatment claim will be granted and Bell's claim of race discrimination will be dismissed.

### 2.  Retaliation

MCW contends that it is entitled to summary judgment as to Bell's retaliation claim because "Bell cannot establish a prima facie case," and he "cannot establish pretext."  (Doc. 25 at 2.)

### a.  Prima Facie Case

In order to establish a prima facie case of retaliation in violation of Title VII and Section 1981, Bell must establish: (1) a statutorily protected expression or activity; (2) an adverse employment action; and (3) a causal relationship between the protected expression and the adverse action.  *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).  MCW contends that Bell cannot establish an adverse employment action because "Bell has presented no evidence that the [ECR] or any other action materially affected his employment in any way.[7]  (Doc. 26 at 23.)  It argues, "Bell filed his only EEOC Charge on August 7, 2012.  MCW's only alleged retaliatory conduct – Bell's September 21, 2012 [ECR] for poor performance[8] – cannot support a prima facie retaliation claim," and "Bell has presented no evidence that the [ECR] or any other action materially affected his employment in any way."  (Doc. 26 at 23 [citing *Austin v. City of Montgomery*, 196 Fed. Appx. 747, 753 (11th Cir. 2006); *Summerlin v. M&H Valve Co.*, 167 Fed. Appx. 93, 97 (11th

-----

[7]MCW also argues that Bell cannot show a prima facie case of retaliation because he cannot prove his EEOC charge was the "but for" cause of his receiving the ECRs.  The court finds such issue is inappropriately decided at the prima facie stage, which requires a plaintiff to show only that the protected activity and the adverse employment action are not completely unrelated.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted).

[8]The court notes that Bell actually alleges two [ECRs] – September 21, 2012, and October 3, 2012 – were motivated by retaliation.  (*See* doc. 29 at 34-35.)

34

Cir. 2006); *White v. Crystal Mover Services, Inc.*, 2014 WL 4662371, at *48 (N.D. Ga. June 24, 2014); footnote added].)[9]

The Supreme Court has held that in order to show an adverse action for purposes of establishing a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2008)(internal quotations and citations omitted). "Under the holding of *Burlington,* the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)(citing *Burlington,* 126 S. Ct. at 2415). The Eleventh Circuit has noted, "*Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Id*. n.13 (citing *Burlington*, 126 S. Ct. at 2417).

---

[9]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority*.**" 11th Cir. R. 36-2 (emphasis added).

Therefore, the court will assume, for purposes of summary judgment, that the ECRs were adverse actions sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination.  Therefore, the court assumes Bell can establish a prima facie case of retaliation.

### b. Pretext

MCW argues that it "is entitled to summary judgment because it issued the Employee Counseling Report for a legitimate, non-retaliatory reason.  MCW's legitimate, non-retaliatory reason for counseling Bell – his violation of MCW's performance standards – rebuts any retaliation inference."  (Doc. 26 at 24.)

"As with [Bell's] discrimination claim, if [MCW] articulate[s] legitimate reasons for [its] actions, [Bell] must then 'show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.'"  *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008)(quoting *Sullivan v. Nat'l R.R. Passenger Corp.,* 170 F.3d 1056, 1059 (11th Cir.1999)).  "To demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Bennett v. Chatham Cty. Sheriff Dep't*, 315 Fed. Appx. 152, 160 (11th Cir. 2008(quoting *Jackson v. Ala. State Tenure COMM'R,* 405 F.3d 1276, 1289 (11th Cir. 2005)).  The Eleventh Circuit has "explained that the plaintiff must meet the employer's proffered

legitimate reason 'head on and rebut it.'" *Mafias v. Sears Home Improvement Products, Inc.*, 391 Fed. Appx. 782, 787 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc)).  With regard to disciplinary actions, "it does not matter whether the plaintiff is ***actually innocent*** of the infraction for which the adverse employment action is taken; the only relevant inquiry is whether the employer ***believes*** he is guilty." *Masso v. Miami-Dade County*, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007)(emphasis added).

Bell contends:

> Bell cleaned cars for a living (for less than minimum wage he alleges). One month after filing his August 2012 EEOC charge, Bell who had been successfully cleaning cars for over two years received a September 21, 2012 written discipline (1st written warning) regarding his car cleaning ability. (Doc. 27-1, pg. 86, Doc 27-2, pg. 122.)  His cleaning ability had never been questioned before.  The discipline was a written warning and left Bell concerned for his car cleaning job.  That discipline was followed by another counseling discipline ten days later on 10/3/2012.  Doc. 27-2 , pg. 120.  Bell was concerned for his employment.  Bell Dec. ¶30-31.

(Doc. 29 at 34-35.)  Assuming this statement is true, it is insufficient to demonstrate MCW's reasons for issuing the ECRs, as set forth on the ECRs, are unworthy of credence.

Although Bell argues he had been "successfully cleaning cars for over two years" and his cleaning ability had never been questioned, the September ECR states that he continued to miss certain parts of cars despite being shown how to clean a car.  (Doc. 27-2 at 122.)  He does not deny missing the door jams, door pockets, cup holders, and ash tray; rather, in his deposition he testified that white employees "missed lots of stuff."  (Doc. 27-1 at 24 [Bell's

37

Depo. at 91].)  He does not deny that he did not follow instructions of a supervisor on October 2012 to go over his work, resulting in a dissatisfied customer.  More to the point, he has not argued or shown that similarly-situated employees who had not engaged in protected activity were not written up for missing cup holders and door jams or for failing to follow as supervisor's instructions.  (*See* doc. 29 at 34-35.)  Therefore, the court finds that Bell has not shown that MCW's articulated reasons for the two ECRs are unworthy of credence and/or that the reason for these ECRs was retaliation for filing an EEOC charge.

The court finds that MCW's Motion for Summary Judgment is due to be granted as to Bell's retaliation claim.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order denying defendant's Motion to Strike, (doc. 34), and granting defendant's Motion for Summary Judgment,(doc. 25), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of March, 2016.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE